The third case this morning is Carlyle Investment Management, LLC v. Moonmouth Company, S.A. Mr. Collot, am I pronouncing that correctly? Collot. Collot. Thank you. My apologies. Not necessary. May it please the Court, I'm Alan Collot of Moses and Singer Counsel for Appellant Plaza Management Overseas. I respectfully request three minutes of my time be reserved for rebuttal. Granted. Thank you. Plaza removed this case from Delaware Chancery Court and plaintiffs moved to remand. The district court found that the defendants had met their burden of showing proper removal based on diversity jurisdiction. However, the district court held first that the defendants were bound by an agreement that they had never signed and to which they were not parties, the 2006 subscription agreement by which Moonmouth purchased shares in Carlyle Capital Corporation. The district court further found that because they were bound by the forum covenant in that the plaintiffs count one claim, which is for breach of seven. Can you hear me? Excuse me? I'm not getting any sound right now. Oops. We can hear you. Can you hear me? Hello? I can barely hear you. What about me? How's that? We can hear you clearly, Judge Roth. Can you hear me? No. All right. Why don't we... We'll take a brief recess until the technology gets installed. Thank you, Your Honor. We'll restart the clock. All right. Thank you. Thank you. Thank you. Thank you. Thank you. All right. We're back in. Are they done? No, no. Hello? Hi. Hi, Judge. Can you hear us now? Yeah, I can hear you. Yeah. Okay. I'll call the other judges that are back. Okay. Great. Thanks. Thank you. You were doing the mute? Yeah. Okay. The mute is right here. Yeah. I think doing it maybe I hit down there instead of... Then that. Okay. Okay, now will they... They'll get my picture back up, will they? Pat? They'll get my picture back up, okay? Yeah, they should see you right now. Oh, okay. They can see you. Okay. Okay, great. Good. Good. I'll disappear until the other judges get back, but I'm right here. Déjà vu, Mr. Collot? Déjà entendu, peut-être, monsieur. Already heard. No, I have no French. We're going to restart the clock at the beginning, please. And I don't know if that was human error or a problem with the IT, but if it was the latter, I'll take it up with the chairman of the IT committee. I think it was my human error. I was trying to hit the mute button and I hit the wrong thing. Okay. Well, thank you. We'll take that off the agenda at next week's IT committee meeting. All right, Mr. Collot. Okay, thank you, Your Honor. As I said, Plaza removed, established and met its burden of showing proper removal, but the district court nevertheless remanded on the grounds, first, that Plaza and Breitenbach, the two defendants, were bound by an agreement they had never signed, the 2006 subscription agreement, by which Moonmouth purchased shares in Carlyle Capital Corporation. The district court also found that the count one claim in the complaint, which claims that the defendants had breached releases that were contained in seven 2009 transfer agreements, was also covered by the forum covenant in the subscription agreement. Let's assume for a minute we agree with you that the district court took a misstep in respect to the subscription agreement. How is it availing to you in light of the fact that two of the seven transfer agreements had the forum selection clause? Well, Your Honor, the two agreement – well, first of all, there are two English transfer agreements. Only one of those has a Delaware forum covenant. The other one does not. So of the seven agreements, one has a forum – a Delaware forum covenant. However, that agreement is governed by English law. And the – first of all, the plaintiffs did not move for remand on the basis of that single transfer agreement. We can affirm for any reason, though. If the record supports, there's nothing in the record. First of all, we had no chance to respond to that ground, which came up in their reply brief. Secondly, the – there's no record of what English law is on whether a non-party can be bound by an agreement under English law. And that agreement is governed not by Delaware law and not by the standards of the Delaware cases, the Hadley cases and the DuPont case of this court. It's governed by English law. And we do cite the MBIA case versus – I forget – a Canadian bank. I forget the name. Let me go back a second, if I may. I missed what you said about the subscription agreement. What is your position of what happened to that? Well, the defendants are not parties to and they're not bound by that agreement. And in order for them to be bound by it, plaintiffs had to show special circumstances under Delaware law. Delaware law is very clear that you cannot bind non-parties to an agreement absent those special circumstances. And the only one they cited and the only cases they cited relate to equitable estoppel. Now, they're trying to distance themselves from that because they realize there is no equitable estoppel here. But they cited equitable estoppel cases and the district court relied on equitable estoppel cases. Unfortunately, it relied on a New York case applying New York equitable estoppel law, not Delaware equitable estoppel law. Well, isn't the Asheville-Holmes case relevant in this consideration? It is, but it is only relevant to the question. And there are other cases that follow Asheville-Holmes, the Maloof case, the Ishimaru case. These are all Delaware cases. And even the Carlisle cases that they cite. But those cases dealt only with the question of when a non-signatory that is closely related to a signatory can invoke, not whether it's bound by, but when it can invoke a forum covenant defensively after it's been sued by a signatory to the forum covenant. So they have that close relationship test established in Asheville-Holmes and those other cases has no application to the Hadley versus Schaefer cases and the DuPont cases, which deal with the question of when is a non-signatory bound by a forum covenant that it didn't sign. And for it to be bound, it has to have acted inequitably. It has to have done something that prevents it from saying, I'm not bound by that agreement. And Delaware law is very clear. The four Hadley cases, Eastman, Weygandt, Hadley, Capital Group, and the four arbitration clause agreements, which we really only focused on as of Monday when we sent a letter to this court calling certain authority to your attention. The DuPont case, which was cited, but also the Hospira case and the cases that it cites. In all of these cases, they say, the courts say that there are only three circumstances in Delaware under which a non-party is bound by a forum covenant. If the defendant has consistently maintained the right to enforce other provisions of the contract, but is disavowing the forum covenant, in that event, it's bound by it. That's an estoppel. You can't take part of an agreement and deny part of it. Secondly, if it has received a direct benefit, direct benefit, under that contract, then it is bound by that contract. If it's received a benefit through a signatory, then that is not a direct benefit. It has to receive it directly. That's what Hadley, Eastman, all these other cases hold. The third circumstance is when, and this is outlined in Weygandt, then-Chancellor Strine's decision, when the defendant is controlled by a signatory. If the defendant is an instrument of a signatory to the agreement, then that non-signatory controlled party is bound by the forum covenant. Those are the only three circumstances under the DuPont line of cases and the Hadley v. Schaeffer line of cases under Delaware law where a non-signatory is said to be closely related to the contract, in quotes, or for it to be foreseeable that they would be bound by the contract. The district court did not find any of those circumstances in this case. And the Hospira case makes clear that under Delaware law, although it's an Illinois decision, it applied Delaware law, the estoppel must be established by clear and convincing evidence, which is not the case here. And also the applied energetics case, which we cited at page six of our reply brief, makes clear, based on Supreme Court precedent, there is no presumption that a non-signatory is bound by a forum covenant. That's a question of state law, state contract formation law. There is no presumption that you can bind a non-party. Now, the question, as I said, there are two issues. One is, were the defendants bound by the subscription agreement? And plaintiffs failed to establish that. The district court didn't find the right grounds for that. It relied on the LaRosse case, which plaintiffs have now disavowed. You'll notice it's not even cited. The main precedent that the district court relied on is not cited in their brief. What about the other transfer agreements, the forum selection clause? Well, they're all permissive. Other than that one English transfer agreement, which doesn't bind the defendants. There are not parties to that. And there's no English law that explains, that was cited to the Court, that explains why they would be bound under English law. But if that's true, you can argue that to the Chancery Court. But we can't get the case back into Federal court. And so we've lost the right of removal based on diversity jurisdiction. That's been stripped of us. There's no remedy. That's why this is a final order that's appealable. But you didn't lose it. You gave it away in the agreement. As I recall, the agreement, it says you could litigate in either Delaware State Court or the Southern District of New York or the U.K. So how can you argue that Delaware State Court is an inappropriate forum? Bundora gave it away. There's no question that Bundora, the signatory, agreed. And who signed on behalf of Bundora? I don't recall specifically, but presumably it's directors. That's who would always sign a contract on behalf of an entity. And the directors of Bundora were who? It's either Plaza or Louie Reitenbach. But they signed as directors. They did not sign as parties to that agreement. There's nothing, they're not recited to be parties, and they didn't sign as parties. And Delaware is clear that if you don't sign as a party, you're not bound by the agreement, absent some other special circumstance. And there was no account. Well, but you may have a problem. Even if we agree with you that there was no direct benefit in respect to the subscription agreement, there was clearly a direct benefit to Plaza in respect to the transfer agreement. That is, that was not argued before the district court, and I'm not sure exactly what that direct benefit would be. It's certainly not a direct benefit that they embraced, that they sought, that they bargained for, that they negotiated for. There's no record of the direct benefit. And it's not clear. What was the purpose of the transfer agreements? That was so that Bundora could sell its partnership interests in Carlisle Partnerships. Right, because Reitenbach had a credit, he had a cash flow issue, right? That's what's alleged. However, the money We have to accept what's alleged at this stage of the case. I accept that, Your Honor. I'm not saying it's fact. No, I understand, Your Honor. However, if Bundora sold its partnership interests, Bundora got the proceeds of those partnership interests. If it gave that money to Reitenbach, that's its business. That is not a direct benefit. No, but Plaza got a direct benefit, and that's why Plaza presumably signed the transfer agreement. It needed the approval to do so. There was no need for Plaza. Plaza was the officer or the director that signed it. But there was no need for Plaza to consent to it, and Plaza didn't get the money. Bundora got the money for selling the agreement. Furthermore, that's the Delaware rule. We don't know what the English rule is. And, in fact, MBI says there is no way to bind a non-signatory under English law. So there's no basis in this record to say that this indirect benefit that maybe Plaza got, which is not established, is a basis for binding Plaza and Reitenbach under English law to this contract. Well, I come back to what I said a minute ago, which is that strikes me as a substantive issue of law that you may be absolutely correct on and may prevail upon, and you can make that argument in the Delaware State Court. Why, what I find very difficult, particularly, there's a lot that's difficult about this case, but what's particularly difficult to me is this sort of potential chicken-and-egg problem between the operation of English law, which you've argued does not allow the Delaware Form Selection Clause and the transfer agreement to be applied to your client. So there are two questions here. There's a question of where to litigate, and then, of course, the what to litigate. And I'm challenging you on why we shouldn't hold that the where to litigate question is answered by the language of the transfer agreement that says Delaware, and that leaves you free to argue the what of English law substantively. Well, and if that is so, is it not up to the Delaware court to decide whether English law or Delaware law is applied and to interpret the applicability of the form selection law and what law is applied to determine who's bound? Well, Your Honors, first, there were seven transfer agreements, and only one of them contains this clause. Excuse me one second. Would you add ten minutes, please, to the clock? I want to try to be fair to both sides, so I'm sorry to interrupt you, Mr. Colon. Okay. Thank you. There's only one of the seven transfer agreements. There's only one. They joined all of them together. They didn't distinguish between any of them. They didn't attach the transfer agreements. This came up after the fact. Had they moved originally based on the English transfer agreement and said that decides this issue, we would have briefed English law, and they would have lost that because English law doesn't permit them to enforce that agreement. So should we remand it to the district court addressing the district court to give a full hearing to that whole issue that you're arguing wasn't properly litigated below? Your Honor, at a minimum, I think we would be entitled to that. I think the record is devoid of any basis for their enforcing the agreement, but if you're going to rule against the defendants on that ground, they certainly should have the right to brief that issue and litigate it in the district court. The second problem is this court has repeatedly held, starting with the Foster case, that remand orders are final appealable orders, and the reason they're final is because they throw the case out of the federal court system to the state court system. So we really have no recourse. If this case is back in state court, yes, we can litigate the questions of whether we're liable under the agreement, et cetera, but we can never get the case back into federal court, even if the district court, excuse me, the chancery court agrees with us. And that, we're entitled to relief from that problem. Are we on? We should spend a minute on the jurisdictional issue then. Yes, we should. Are we under 1447, or are we under? This case was not under 1447. It was not, the remand order was not issued under 1447C, and it was not affected by 1447D. The parties agree on that point. What plaintiffs have done. So the mailing rule only applies if you're under 1447. Yes. Now, we, I think we made a, we did not view the issue broadly enough, and so we missed some cases that we called to this court's attention on Monday. We got focused on the argument they're making, which is did the district court have jurisdiction or lose jurisdiction, which is we think the Hudson United Bank and the Agostini decisions decide that. If it's remanded under 1447C, then the district court loses jurisdiction. If it's under, if it's not under 1447D, then Hudson says it retains jurisdiction to reconsider. They're trying to argue that there's a little bit of space between those two cases and that Hudson only applies to discretionary remands under 1367. But we missed the fact that twice this court in Powers v. Southland and Carr v. American Red Cross addressed this issue, and this court held that the fact that the district court has lost its jurisdiction because it mailed the remand order does not affect this court's appellate jurisdiction under 1291 with respect to the final appealable order. This court maintains its jurisdiction until it disposes of the appeal or it's withdrawn. Those are the controlling decisions on this issue, and after the Powers case and the Carr case, this court has issued three decisions deciding appeals of remands based on forum covenants where it didn't address the issue because the issue had been decided by Powers and Carr, but where it reviewed despite the mailing of the order. And we briefed those cases, Souter, New Jersey v. Merrill Lynch, and PGT Trucking v. Lyman, and we went to the record in the last of those, PGT Trucking, and this issue was actually briefed by the parties, but the court saw no need to address it in its opinion. So plaintiff's argument depends on the assumption that this court three times reviewed non-reviewable remands by mistake, by inadvertence, despite the fact that it had been briefed to this court. I don't think that's the situation. The law is simply that the district court's clerk's mailing of the remand order had no effect whatsoever on this court's appellate jurisdiction, and frankly it had no effect on the district court's jurisdiction either had it wanted to reconsider. So that's what we have to say on jurisdiction. I guess I still have time. Thank you. You don't have to use it. I did want to touch on the misstep of the district court. First, it was cited, the LaRosse Partners New York law case, and it relied on that as its principal authority. Now, plaintiffs have walked away from that case. Instead, though, they cite the Synergis case, which is a Third Circuit district court case, but it's Pennsylvania law. It's not Delaware law. It should not be considered by this court on the close relationship of the parties issue, which is the Asheville issue. The district court relied on the Asheville line of cases, which is simply that applies to the question of whether they could invoke the covenant, not whether we were bound by the covenant. And it did not find the basis for an estoppel. It didn't find that the defendants did anything that gave rise to an estoppel. But let's assume that we were bound by the forum covenant for some purpose in the 2006 agreement. Then the question is, does it apply to the 2009 releases? And it doesn't apply by its terms, which require that the dispute be with respect to the subscription agreement, and it doesn't apply under the Hadley cases, which require that the dispute under count one arise under the subscription agreement. All the district court said was it was related to. That's not enough of a finding to support it. And plaintiffs actually admit in footnote 20 at page 39 of their brief that the arise under the subscription agreement standard is the correct standard, but they finesse it. They don't answer it. Wasn't the district court essentially saying that? Saying what, Your Honor? That it did arise out of the agreement. No, it said it was with respect to. It clearly doesn't arise. The claim that you breached releases from 2009 signed by other parties cannot possibly arise from the Moon Mouth subscription agreement. It has no relationship to it. Now, there's another problem with the district court's decision, which is it didn't want to get involved in interpreting the agreements, but it had to because the count one claim says you breached a release, and that release released prior agreements, and it released the subscription agreement. The DuPont and the Jordan versus SEI cases that we've cited. How do you release an agreement? I mean, you can terminate an agreement, but I've never this, quote, release an agreement, unquote. What does that mean? It means that you cannot enforce the agreement and no claims survive under that agreement. And that's what the New York Primex versus Walmart and applied energetics cases that we cited say. It doesn't mean that the agreement no longer exists. It means that you release claims under that agreement. Well, it means more than you release claims. It means you can't enforce the agreement either. They wrote the releases. These are their releases. They released contracts, covenants, agreements, understandings, all of this, and they released all claims arising under these agreements, and they released all present and future claims in any way based on any past matter, which includes the 2006 subscription agreement. So clearly the releases did not leave the subscription agreement unaffected out there for them to base a claim on and base jurisdiction and venue on. It didn't exist any longer. And the district court ignored the governing New York law, and it ignored the DuPont. Can you cite me a case where you say that it says releasing absolutely every claim under an agreement, every contract under an agreement, every consideration under an agreement, terminates the agreement itself. On page six of our reply brief, we cite a series of New York cases that the Primex case, the Applied Energetics case, Thales, there's another case, and then there's some cases from other jurisdictions. And one of them puts it very well. When you release an agreement, that agreement is history. Now, the question, I'm not arguing now that had we sued them with respect to the subscription agreement, had Moonmouth brought a suit that that would not be governed by that agreement. But I'm not arguing. I'm not saying that they would or wouldn't. I'm saying that they could not enforce that released agreement when they're claiming that the agreement that releases it was breached. And that's exactly what Primex case, the Primex case says. In Primex, there were three agreements, and the last agreement had a merger clause, which was not a release, but it has the effect of releasing the prior agreements as to that last agreement. And the district court, excuse me, the New York Court of Appeals held that if there was a suit under the first agreement, that was still governed by the forum covenant in the first agreement. Let me ask you a question. How can you say the subscription agreement is no longer in effect, is nonexistent, when you are bringing claims or threatening to bring claims against the plaintiffs for the way they managed the securities that were bought under that agreement? The defendants here did not threaten to bring any claims. The Moon Mouth had its lawyers in the Netherlands send a letter that told the statute of limitations as to any claims that Moon Mouth might have. And then in the last page of that letter, it says this also told any claims that Plaza and Reitenbach may have. It doesn't identify any claims. It doesn't assert any claims. It doesn't say we have any claims. It didn't invoke the agreement. It didn't rely on the subscription agreement. It simply said, under Dutch law, we can preserve whatever claims we might have by sending a tolling letter. What other relationships were there that would give rise to the claims? There were no relationships that would give rise to the claims. Well, there was a relationship with a subscription agreement among them. That is a relationship that Moon Mouth had. It's not a relationship that Plaza – No, but you just said Plaza reserved its rights and Reitenbach reserved its rights. Rights under what? As far as I can tell from this ample record, the only involvement that Plaza and Reitenbach had, albeit tangential, was under the subscription agreement. But they didn't assert they had any rights. They said whatever rights we have – No, which we don't know what they are. It almost seems like a nullity, though. It was a nullity. That's exactly what it was. It was legal boilerplate that had no legal effect. Remember, the test under this Court's DuPont decision is consistently maintained. But if it was intended to toll the statute of limitations, I mean, the drafter must have – Correct, but it wasn't invoking the subscription agreement. It was invoking Dutch law. It was not an attempt to consistently maintain the right to enforce other provisions of the contract. There's no evidence that the defendants consistently maintained that they had rights under the subscription agreement that they were going to enforce. It doesn't pass the test of the DuPont decision. Okay. Thank you. We'll hear your rebuttal, Mr. Kolod. Thank you, Your Honor. Ms. Teich? Did I pronounce that right? You did. Okay. Good morning. May it please the Court. My name is Sarah Teich of Williamson Connolly on behalf of the Carlisle Plaintiffs Appellees. I'd like to start this morning with the issue that Mr. Kolod spent the most of his time discussing, which is the non-signatory question of whether Plaza and Wrighton Bar are bound by the subscription agreement as well as the transfer agreements. First, as Judge Hardiman noted, whether they are bound by the subscription agreement or not is essentially irrelevant because they are certainly bound by the transfer agreement, which has a mandatory Delaware Forum Selection Clause and which clearly governs count one of the complaints. All right. Let me stop you right there. Why shouldn't we have the district court analyze this after a full hearing? Because clearly that issue of the transfer agreement was a Johnny-come-lately argument. It may be a winning argument, but it really wasn't fully aired in the district court, correct? With respect, Your Honor, it was fully aired. It was raised in our opposition to their motion to dismiss. In the lower court, the remand motion and the motion to dismiss were briefed simultaneously in an overlapping fashion. So Mr. Kolod said that they had no opportunity to reply. That's untrue. They did have a reply to the motion to dismiss, and they addressed the transfer agreement argument in their reply brief to the motion to dismiss. So it was briefed by both sides before the district court, and the district court had the transfer agreements before it. The district court didn't reach the transfer agreement because it concluded, rightly, that the subscription agreement's broad forum selection clause encompassed both claims and applied to all parties, and that certainly is true. But even to the extent the court has questions about the non-signatory issue or the complexities of the Hadley Doctrine or any of the other cases, the court has before it here, and it was fully briefed below, the transfer agreement, which clearly has a mandatory Delaware forum selection clause that applies not only to the signatory, Bandora, but also to Bandora's affiliates. If you look at the language of the mandatory Delaware forum selection clause in the transfer agreement, it says that the parties irrevocably agree that any suit, action, proceeding, or dispute by or against any party or any affiliate of any party, which clearly encompasses Plaza and Mr. Reitenbaugh. Mr. Kolod said that he didn't quite recall who had signed the transfer agreement. It was Mr. Reitenbaugh himself. So Mr. Reitenbaugh, who is the whole owner, the complete direct beneficiary of all of these entities, he is the signatory of the Bandora transfer agreement. He is certainly within the definition of an affiliate of Bandora. But that agreement also says apply English substantive law, and as I understand, English substantive law can't be enforced against non-signatories. Your Honor is correct that it does say English substantive law governs. However, if Plaza wished to argue that English substantive law differed from Delaware law and therefore the application of this contract could not encompass Plaza and Reitenbaugh, they had to prove English law before the lower court or even before this court. They have not until their reply brief here cited what is a single U.S. case saying what the court believes English law to be. There is no affidavit of foreign law. There is no citing of English law cases. There is no evidence here that English law precludes the binding of non-signatories. This court has to apply Delaware law because there is no evidence as to what English law is before it. Applying Delaware law, as you would also to the subscription agreement, it's clear that even as non-signatories they're bound, but this provision says it by its own terms that it is binding affiliates. So this clause is not the same as the subscription agreement foreign selection clause, which simply says the parties agree that they will litigate exclusively in Delaware. This clause, which Louis Reitenbaugh himself signed, says the parties agree that disputes by their affiliates will be litigated exclusively in Delaware and nowhere else. So whether English law binds non-signatories or not, Mr. Reitenbaugh bound himself when he signed and said both Bandura and its affiliates, including him, would agree to litigate exclusively in Delaware. Is there any question that these are affiliates? No. There is no question. We allege that in the complaint, and they have never contested that. I don't think that they possibly could. Mr. Reitenbaugh and Plaza are directors of Bandura. They are the whole owners of Bandura. They are beneficial owners of what Bandura owns. As Judge Hardiman pointed out, the context in which the transfer agreement was executed was that Mr. Reitenbaugh personally, as well as Plaza, needed to generate some liquid capital and needed to sell some assets in order to pay off other debts. In that context, clearly the purpose of the agreement was to provide capital, to provide the results of these sales to Mr. Reitenbaugh and to Plaza. So they meet the definition under the terms of the agreement, and they certainly also received direct benefits. They were contemplated third-party beneficiaries. No matter what test you were to apply. Under the transfer agreement. Under the transfer agreement. Right. You really seem to have a problem under the subscription agreement, do you not, because of the absence of those facts? I mean, it strikes me that the subscription agreement argument that you made below and that the district court accepted does great violence to the whole corporate form. I mean, it really requires the complete disregard of the corporate form, does it not? Your Honor, it's a fair concern, but I think in this case it's not justified. And that concern could have been raised as well in Weygant and Capano, which are both cases decided by the Delaware Chancery Court. If this court were to look at those two cases, and of course the Delaware state courts give great deference to the corporate form and consider that to be of great importance, in those cases the court found that because this was a small group of entities, all controlled by an individual person or a couple of people, they are essentially they didn't use the alter ego language. Well, that's my problem. I mean, if the trial court made a finding of, you know, piercing the corporate veil, that this is all one big shell game that Reitenbaugh is playing, et cetera, et cetera, you know, you wouldn't have the problem that it strikes me you have in respect to the subscription agreement. There were no findings along those lines, were there? There were not, but under Delaware law, findings of piercing the corporate veil are not necessary. The Hadley test, which Plaza repeatedly points to and claims that the district court improperly applied or failed to apply, which is certainly not true. The district court explicitly found that Plaza was closely related to the agreement, which is one of the ways under Hadley that a non-signatory can be bound. Does that presume that you have to be the defendant, you have to be sued? There is no case saying that the closely related test requires that the non-signatory have been sued. It's true that the test is applied in two sets of circumstances. It is applied both where a signatory is enforcing against a non-signatory and in the reverse where a non-signatory is enforcing against a signatory. In both cases, Delaware courts talk about the close relationship to the agreement or to the parties, but there's no case saying that a non-signatory must have first been sued. Plaza says that, but that's not a holding or articulated anywhere in the cases, and it doesn't make sense. And, frankly, there are Delaware cases in which non-signatories have offensively enforced, namely the NIG case decided by the Delaware Supreme Court in which the same group of plaintiffs similarly sued offensively to enforce a forum selection clause, and the Delaware Supreme Court affirmed and agreed that they could get injunctive relief to enforce that clause. So it's obvious that whether offensive or defensive, the clause like this can be enforced. It's sort of a defensive-offensive maneuver anyway, I guess. Yes, but the cases don't focus on that issue. They focus on the close relationship of the parties. And if I can get back to Judge Hardiman's question. Yeah, and the direct. I mean, how do you satisfy the direct benefit that's, again, just focused on the subscription agreement? Your Honor, under the Hadley line of cases and under all of these cases, a party can demonstrate that a non-signatory is bound either by showing a direct benefit or by showing that it was foreseeable that the non-signatory would be found. And the Weygandt case that I mentioned earlier and Capano v. Lockwood case are both cases in which the close relationship of the parties was found to be the basis on which it was foreseeable that a non-party would be bound. And that's where we get back to this question of whether you need to, for example, pierce the corporate veil. If the parties have such a relationship, if the facts are, as alleged or as presented to the court, clear that these parties are so intertwined with one another that at the time of signing the agreement they would foresee that each of them or that others besides the signatory would be bound, that is sufficient. And that's what Delaware law has held. There's no case to the contrary that I'm aware of. You don't need to pierce the corporate veil. You don't need to formally plead alter ego. You need to demonstrate that it's foreseeable that a non-signatory would be bound by the nature of their relationship to a signatory. And here we're talking about Mr. Reitenbaugh and several entities, all of which are wholly under his control, all of which are different elements of how he carries out his personal investments, his business operations. These are all just elements of the same whole piece, which is him and his financial business. It is entirely foreseeable under Wagan, under Capano, under the Hugel Seventh Circuit case that is cited by the Wagan court that Mr. Reitenbaugh personally and that Plaza, which, of course, was the sole director of Moonmouth Plaza, which executed the subscription agreement on behalf of Moonmouth Plaza, which had authority to control and to make investment decisions for Moonmouth, it's foreseeable that Mr. Reitenbaugh and Plaza would be bound. In fact, Mr. Reitenbaugh is alleged in paragraph 25 of our complaint. At some point after initially executing the subscription agreement on behalf of Moonmouth, unilaterally decided to transfer approximately a third of Moonmouth's holdings to another one of his wholly controlled companies, which I think underscores the fact that this is all within a small network of closely related companies. It's all part of his domain of control. So this is not an instance where we're talking about a major company like GE and some subsidiary that's three tiers down, and a parent and the subsidiary are not directly involved on a day-to-day operational basis. I don't recall that the district court went into this level of detail. The district court did not go into this level of detail. Isn't that important here? I'm not sure that it is. The district court concluded that it was clear that there was a sufficiently close relationship between Plaza and the contract, and that is the test under Delaware law. She concluded that that test had been satisfied. The fact that she didn't make factual findings in sort of each step along the way I think is not relevant. In any event, this court certainly can affirm that finding based on its understanding of the facts. These facts were in the record before, or were they? Yes, they were, Your Honor. Yes. If I could just move along to the second of the issues related to the subscription agreement and its application here. Mr. Kolod argued here today that the subscription agreement had been released by the 2009 releases. I'd like to draw Your Honor's attention to their brief, in fact, their two briefs, in which they make quite clear that that's not actually the argument they're making. The argument they're making is a judicial estoppel argument. They are not arguing that in fact, as a matter of contract interpretation or anything else, that the subscription agreement has been released, although oddly he said that today. Their argument is that our allegations are inconsistent and therefore give rise to an estoppel that prevents us from asserting claims or enforcing the subscription agreement. That is wholly untrue. Now, the reason why PLAZA has taken that very carefully crafted approach is because PLAZA and Mr. Reitenbaugh continue to have other investments with Carlisle today. If they were to take the position that the 2009 transfer agreement eliminated all of those contracts and rendered them nonexistent and unenforceable, Mr. Reitenbaugh would lose tens of millions of dollars of his assets that are currently invested with Carlisle. He certainly doesn't want to do that. He made clear he wasn't making that argument. Yes. Careful, prudent lawyering. If this is an issue of an estoppel, the court need look no further than our complaint, paragraphs 22, 26, 28, 95, in which we allege very explicitly that both the subscription agreement and the form selection clause were and remain valid and binding contracts. So clearly, the effect of the 2009 releases is an issue that may be litigated on the merits in the proper court, in the court that is selected by the contractual form selection clause. It is not the district court's job on a remand motion, nor is it this court's job to delve into that merits issue of what the interrelationship between the contracts is. That's an issue that is wholly bound up with the merits. As the D.C. Circuit said in the Marra case, that would be putting the cart before the horse. It would be absurd for a district court or a trial court hearing a preliminary threshold jurisdictional question to make conclusive determinations about whether a particular contract was valid, had been terminated, had been released, was void as against public policy. Any of those types of arguments are precluded. So the argument about the effect of the 2009 releases is legally futile and is also defeated by the fact that it's presented only as a point of estoppel where our allegations are plainly not inconsistent, but rather are quite consistent. If I could just turn to the jurisdictional question very briefly before my time expires. Mr. Cole. You'll have ten more minutes, too. Ten more minutes? Okay. Which you won't need to use, which you don't have to use. I don't have ten more minutes to think about it. I leave it up to you whether you need to use it. Okay. As to the jurisdictional argument, Mr. Colad pointed the court today to the Carr case and made an argument about the effect of the collateral order doctrine and whether a remand that's unreviewable can become reviewable. All of that is beside the point, but the issue that Carr could be but is not, in fact, illuminating on is whether this court could maintain appellate jurisdiction if the mailing rule were applied and the district court had ceded jurisdiction entirely to the state court upon mailing the notice of remand. That argument was made in the Hudson case, and this court in Hudson said, no, if the mailing rule applies and the district court has lost jurisdiction by sending the case in its entirety back to state court, then, of course, we cannot have appellate jurisdiction. We cannot take jurisdiction from the district court that it itself does not have. Of course, in the Hudson case, the court went on to conclude. 1367 case. I'm sorry? 1367. Yes. Applying 1367. Yes. The court went on to say because it was a 1367 remand that the mailing rule was not applicable, but it's clear. And isn't it more analogous to our case than the 1447 cases? No, Your Honor. Our case is more like the 1447 cases because, as we explained in our brief, in this instance, once a district court concludes that a forum clause is valid and applies to the claims and to the parties, it's a mandatory remand. You must enforce it, and they must send the case back and give effect to the party's waiver of the right to seek a federal forum and an agreement to litigate in state court. And so the mandatory nature of this remand and the fact that this is a remand that involves a threshold, straightforward legal question of whether the claims and the parties are covered or not, whether the clause meets the presumptive validity test or not, makes it much more like a 1447 case in which the court makes a threshold determination of whether diversity jurisdiction is present or whether there was a defect in removal. And having made that decision, that decision is final and the case goes back to state court and that this case should be treated in the same way. But isn't there a substantive difference in the cases involving the lack of subject matter jurisdiction in the first instance? There, the trial courts have no power to hear the case. Why isn't that an important distinction? Your Honor is certainly correct that in a forum selection clause case, the district court has subject matter jurisdiction. It's not a case that the court cannot hear. But as this court has previously said, and I think this was in the Foster case, a forum selection clause remand is a case that never should have been in federal court. It is one where the parties agreed to be in state court and they agreed to stay there. Unfortunately, we've said a few things that are not entirely consistent. Well, it happens to all of us. So although it's not a subject matter jurisdiction issue in the same way that you would have in a lack of diversity case, that fact that this is an instance where the case never should have been in federal court and should not stay there makes it more like a 1447 remand. Whereas in a 1367C case, of course, the case could be in either place and it's entirely a discretionary decision by the district court whether it wants to exercise supplemental jurisdiction. That is inherently a different kind of decision and one where it makes sense to have appellate review unlike the sort of black or white, yes, we have jurisdiction, yes, there's a forum clause or no, there's not. If we accepted your position, aren't we running the risk of establishing a dangerous precedent by rendering a lot of cases unreviewable in this court that really should be reviewable? Your Honor, it could have the effect of rendering many cases unreviewable. I would suggest that the court could look to what it did only a few months ago in the Agostini case. In that case, the last sort of paragraph of this discussion in the court's opinion said district courts would be well advised to pay attention to the mailing rule and instruct the clerk of the court to hold off on mailing the remand notice. If there was some reason why it was a close call, the court might want to reconsider, the court thought there might be a need for giving some time for any further actions by the parties. The same could easily be done here such that in an instance where the forum clause raised particularly nuanced or complicated questions, a district court could instruct the clerk to hold off on mailing and therefore make the case susceptible to review on appeal or by the district court itself. If there are no further questions, I respectfully suggest that the court. Judge Roth, do you have any other questions for this? No, I don't. All right. Thank you. Thank you, Ms. Teich. A rebuttal, Mr. Kollox. Thank you. Just quickly with respect to the jurisdiction argument, I think the point they're making is that had the district court reconsidered the order and had it not had jurisdiction to reconsider it, then our appeal of the reconsideration order might not have been within this court's jurisdiction. There was no reconsideration here. We did not appeal a reconsideration order. We appealed the original order, which Foster makes clear is a final appealable collateral order. Now, with respect to whether we had a chance in front of the district court to address the effect of English law on the transfer agreements, as Ms. Teich made clear, that was briefed in the motion to dismiss. The district court, it was not briefed in the remand motion. The district court did not address the motion to dismiss. There's no evidence in the remand order that it considered any of those arguments. I think human nature will tell us that the district court probably did not plow through the motion to dismiss papers and then say, I'm not going to get to this. I think the court decided the remand motion, period, and there's no reason to tar us with what was in papers that the district court never evidenced any consideration of. The issue was joined, though, before the district court. It just wasn't really the focal point or it wasn't addressed by the district court. Exactly. It wasn't addressed. But it could have been. But it wasn't. And, therefore, there was no – there's no record that supports any basis for the estoppel on that. All right. But let's parse that a little bit because I think whether that issue ought to be remanded or decided by our court largely depends upon what might happen if it were remanded. What fact development or, you know, what would need to be said in the district court upon remand that we don't already know? The English law would have to be briefed on the question of the effect of a contract on a non-signatory to that contract. All right. That would have to be done. But that's if and only if we disagree with Ms. Teich's argument that the reference and the transfer agreement to affiliates as a matter of law included plaza. Correct. Well, again, that depends on whether – there's no question the affiliates did not sign the agreement. So if English law does not make a non-signatory libel on a contract, it doesn't matter what the contract says. What matters is whether they're bound by the contract. So the question of –  Wait a minute. What if the contract says – the contract is between Bundura and Carlisle? Partners. Partners. And that agreement says – this agreement also applies to our parent corporations, which we recognize are non-signatories. Is it your argument that English law somehow vitiates that plain language of the contract? If English law does not permit enforcement against a non-signatory, which is my understanding of English law, then it would. But that presupposes, though, that there's not some contractual provision dealing with the liability of non-signatories, right? Well, the – you'll have to look at Section 16, which is the provision they deal with. But it is not a consent by the affiliates to jurisdiction in Delaware. That's not what that provision is. So now – Why not? It doesn't – it doesn't read that way. Now, with respect to the alter ego issue, I think Your Honor hit upon something exactly right. They are making alter ego noises, but that was not the basis for their motion, and there's no record to support alter ego. They also – they use the word the closely related test. There is no closely related test. There are two tests, closely related to the contract, which is the Hadley test, and closely related to a signatory, which is the Aschel-Holmes case. And they are two very different tests that are applied in different contexts, and the distinction makes perfect sense. And the reason it makes sense is because both tests are based on estoppel. And estoppel prevents somebody from taking a position and then taking a contrary or contradictory position. So if you think about why someone might be bound by an agreement they didn't sign, well, if they receive direct benefits or if they seek to enforce that agreement, then they're stuck with the agreement and they're bound by it. On the other hand, if you look at why a non-party might be able to enforce the agreement, well, if a party to the agreement, a signatory, sues them and they're closely related to another signatory, then the party who violated the covenant by suing them is estopped from denying that they have standing. So the distinction between these two tests makes perfect sense. Thank you. Well, but to continue your thought on that last point, if the party, the non-signatory party is being threatened to be sued and they initiate litigation to enforce the contract, isn't that the same as your flip side? Your Honor, I would agree that had PLAZA sued plaintiffs to recover Moon Mouse investment, Asheville Homes might well have applied to that situation. But that's not what happened. And it doesn't, even if it were true, it doesn't go far enough. It doesn't bring in the transfer agreements. PLAZA threatened to sue or the Reichenbach group threatened to sue, and therefore to preclude that happening, the plaintiffs came forward and said, you can't sue us because of the agreement, and that is the flip side of what you said. But, Your Honor, on this argument I focused on the count one claim. I didn't deal with the count two claim. I dealt with the count one claim. The count two claim is you threatened to sue us and we can enjoy that. And if that is remandable, so be it, because there's no intention of suing them and we don't care what happens to that claim. It's the count one claim, which is not remandable, because it deals with this entirely different set of agreements that has really nothing to do with the subscription agreement, other than their PLAZA parties on one side and their Carlisle parties on the other side. And that makes a mess of Delaware corporate law, Delaware law on when a contract binds parties. Okay. I think we're getting back to what we said. Can I ask Judge Hardiman, can we get a transcript of this argument? Certainly. Would you ask the parties to share that expense equally? Okay. Absolutely, Your Honor. That ought to be a drop in the bucket compared to what's happened thus far. The liquidator can help us out. And the court is extremely grateful to counsel for both sides. This case was expertly briefed and your oral arguments were remarkably helpful in trying to help us untangle what's a very difficult case. We'll take the matter under advice.